J. F. McNamara Corporation and another, Appellants, v. Industrial Commission and another, Respondents.*

*April 30—June 5, 1964.*

* Motion for rehearing denied, without costs, on July 30, 1964.

302

For the appellants there were briefs by *Hughes, Anderson & Davis* and *Crawford, Crawford & Cirilli,* and oral argument by *Harold Witkin,* all of Superior.

For the respondent Industrial Commission the cause was argued by *Beatrice Lampert,* assistant attorney general, with whom on the brief was *George Thompson,* attorney general.

For the respondent Earl D. Kauti there was a brief and oral argument by *Rodney J. Edwards* of Superior, guardian *ad litem.*

FAIRCHILD, J.   Exhibit 25, reproduced herewith, is an aerial photograph of a portion of property owned by Great Northern Railway Company and devoted to various activities incidental to the operation of its transportation system. The camera is pointed toward the north and the waters of St. Louis Bay. The merchandise dock and shed, where Kauti was performing services, are at the northwest corner of the area, at the waterfront. The ship being unloaded was in the slip immediately east of the dock and shed. East and south of the slip are elevators, owned by Great Northern, but leased to and operated by Archer-Daniels-Midland Com-

pany. Railroad tracks run south from the merchandise dock. There are other tracks south of the dock and slip, and 17

other tracks, used for grain storage in connection with the elevators, run southerly from the elevators. All are owned

by Great Northern. Directly east of the grain-storage yard is the main-line transfer track of Great Northern. It comes from yards to the south and connects near the waterfront with the main line of the Northern Pacific. The nearest connection between the grain-storage yard and other tracks in this area and the main line transfer track is about 4,400 feet south of the merchandise dock. The main line of the Northern Pacific runs north and south and is east of the Great Northern property.

Kauti was struck by an engine on the main-line transfer track. He reached that point by walking east and southeast from the merchandise shed and across the grain-storage yard. He and his companion intended to walk east and southeast across the Northern Pacific and other railroad properties to reach a residence area where they would have lunch at his friend's home.

The commission found that this was the ordinary and usual way for employees who walked to or from work in the dock area, and there was evidence to support this finding. A roadway ran directly south from the merchandise dock, and this was used for transportation by car. It would also be possible to walk 1,400 feet south from the dock along this road, and then walk east upon an elevated foot bridge (shown in the foreground of Exhibit 25), extending across all railroad tracks in the area. There was testimony that because of the greater length of this route, those who came and went on foot ordinarily followed a route similar to Kauti's.

An employer is not liable for workmen's compensation benefits unless at the time of the injury the employee is performing service growing out of and incidental to his employment. The question in this case is whether the commission properly applied sec. 102.03 (1) (c), Stats., providing in part:

"Every employe going to and from his employment in the ordinary and usual way, while on the premises of his employer, . . . shall be deemed to be performing service growing out of and incidental to his employment; . . . The premises of his employer shall be deemed to include also the premises of any other person on whose premises service is being performed."

We shall consider the principal contentions of McNamara Corporation with respect to the statute just quoted, and particularly the last sentence thereof.

(1) *Whether the premises of McNamara for this purpose include the premises of Great Northern.* It is clear that McNamara was not performing services for Great Northern. Great Northern had permitted the ship Bambi to use its dock facilities and had assigned space in its warehouse for the temporary storage of cargo. Those in charge of the Bambi had employed McNamara to unload the vessel and place the cargo in the shed. Ultimately the goods would be shipped to other points over the Great Northern. It is clear that McNamara was exercising control over only a portion of the dock and merchandise shed.

Thus McNamara was performing service on Great Northern's premises, but not for Great Northern. Literally applied, the last sentence of sec. 102.03 (1) (c), Stats., quoted above, would cause McNamara's premises to be deemed to include Great Northern's premises. McNamara contends, however, that the last sentence must be construed to require that services were being rendered for Great Northern. This argument is based upon the history of the enactment.

The last sentence was added by ch. 270, Laws of 1943, and resulted from the decision of this court in *Hunzinger Construction Co. v. Industrial Comm.*[1] In that case, a contractor was constructing a building on a part of a large in-

---

[1] (1943), 242 Wis. 174, 7 N. W. (2d) 578.

dustrial plant. An employee of the contractor was injured while going from work, but while on the premises of the industrial plant. It was held that the premises of the contractor-employer included only the building over which he had some right of control, and that the employee was not entitled to compensation because he was not on his immediate employer's premises. McNamara points out that in a comment on Bill No. 210, S., 1943, which became ch. 270, the advisory committee on workmen's compensation legislation did describe the measure in terms of the immediate employer and a second employer for whom service is being performed by the immediate employer.

Although the fact situation in the case which led to the amendment was one in which the immediate employer was performing services on the premises of another and for that other, we find that no sufficient reason to read into the sentence a restriction which the drafters did not see fit to incorporate, and we conclude that the sentence is applicable here simply because McNamara was performing services on the premises of Great Northern.

(2) *Whether the "premises" of Great Northern, for these purposes, included the main-line track where Kauti was injured.* Concededly Great Northern owns both the shed and dock where Kauti worked and the main-line track where he was injured. All portions of Great Northern property shown in Exhibit 25 are used for various types of activities incidental to Great Northern's business of transportation. The dimensions of the Great Northern property shown in Exhibit 25 appear to be about 3,000 feet north to south and about 530 feet east to west. Although this is a large area, and functions are performed in various portions, we conclude that the commission could reasonably determine that the entire area constitutes a single premises of the Great Northern, at least to the extent it was under Great Northern's control.

McNamara lays stress upon the facts that the elevators at the north and center of this area are leased to and operated by Archer-Daniels-Midland Company; that the company has a degree of control over operations of Great Northern in the grain-storage yard; that the elevators and grain-storage yard lie between the merchandise dock and the main-line transfer track; and that Kauti crossed some part of the leased premises on his way from his work to the point of injury. We see no controlling significance in those facts, albeit a different question would have been presented if the injury had occurred at a point not under Great Northern's control.

It has been recognized that under some circumstances an employer may effectively limit a particular employment premises by physical barriers so that other property he owns in the vicinity is not deemed a part of the employment premises.[2] There seems to have been no attempt to limit the extent of the premises here, even by rule. This court has also recognized that where an employer has widely separated employment premises, an employee who works at one of them and is injured while at the other in order to call for a friend is not deemed to have been injured on the premises of his employer for the purposes of this statute.[3] This decision has no application to the instant case.

In upholding the commission's application of the statute, sec. 102.03 (1) (c), to the situation before us, we bear in mind the purposes of the Workmen's Compensation Act, and the apparent intent of the legislature that where one employer performs service on the premises of another, the employee of the former is forced to cross the premises of

[2] *International Harvester Co. v. Industrial Comm.* (1936), 220 Wis. 376, 384, 265 N. W. 193. See, however, *American Motors Corp. v. Industrial Comm.* (1962), 18 Wis. (2d) 246, 251, 252, 118 N. W. (2d) 181.

[3] *E. W. Hallet Construction Co. v. Industrial Comm.* (1930), 201 Wis. 182, 184, 229 N. W. 547.

the latter and expose himself to whatever hazards are present, in order to go to and from work. Here the risks involved in crossing a railroad yard are obvious. The employer could doubtless exercise some control over the route to be followed, but the statute requires only that the employees travel "in the ordinary and usual way." In the light of the underlying purpose of this section, it seems to us that the extent of the premises involved should be determined as liberally as is reasonable.

*By the Court.*—Judgment affirmed.

WILKIE, J., took no part.
HALLOWS, J., dissents.